SC:RMR
F.#2008R01237

**M-08-640**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

AMIT SRIVASTAVA,

        Defendant.

- - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(T. 42, U.S.C., § 1320a-7b(b))

EASTERN DISTRICT OF NEW YORK, SS:

      JODI COHEN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that in or about and between January 2008 and June 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AMIT SRIVASTAVA, together with others, did knowingly, intentionally and willfully conspire to solicit and receive remuneration in return for referring individuals to a person for the furnishing of a service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

      (Title 18, United States Code, Section 371.)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with the FBI for approximately two and one-half years. As a Special Agent, I have participated in numerous investigations, during the course of which I have conducted physical surveillance, overseen the consensual recording of conversations involving cooperating witnesses and individuals engaged in criminal conduct, executed court-authorized search warrants, and used other investigative techniques to secure relevant information regarding various crimes, including crimes involving health care fraud.

2. Among other duties, I and other Special Agents in the FBI, along with Special Agents with the United States Department of Health and Human Services ("USHHS"), are participating in an investigation into various individuals in the New York City-area who are soliciting and receiving cash kickbacks in return for referring patients to specific medical facilities, including radiological imaging facilities that perform procedures such as Magnetic Resonance Imagings ("MRIs") and Computerized Tomography scans ("CT scans").[1]

---

[1] CT scans are sometimes referred to as CAT scans, and MRIs are sometimes referred to as MRs. At various times during consensually recorded conversations referred to in this complaint, the terms CT scans and CAT scans, and the terms MRIs and MRs, are used interchangeably.

3. As is set forth in this affidavit, the investigation in this matter has revealed that the defendant AMIT SRIVASTAVA is conspiring with others to solicit and receive cash kickbacks in return for referring patients to specific radiological imaging facilities, including a facility in Queens, New York that is overseen by a cooperating witness (the "CW").[2] The investigation has further revealed that, in exchange for having doctors send their patients to the Queens facility, SRIVASTAVA solicits and receives kickbacks of between $120 and $135 per MRI performed and between $75 and $85 per CT scan performed; that SRIVASTAVA shares the kickback payments with the doctors who are referring their patients to the Queens facility; and that payments for these MRIs and CT scans are being made by, among others, Medicare, Medicare managed care plans, and Medicaid managed care plans.[3]

4. The facts set forth in this affidavit are based on my personal participation in this investigation. More

---

[2] During the time period discussed in this complaint, the specific location of the radiological imaging facility overseen by the CW moved from one neighborhood in Queens to another. For purposes of the complaint, the two locations of this facility will be referred to, collectively, as "the Queens facility."

[3] Medicare managed care plans are funded entirely with federal funds, and Medicaid managed care plans are funded in part with federal funds. As a result, I understand that pursuant to 42 U.S.C. § 1320a-7b(f), these managed care plans, together with Medicare and Medicaid themselves, constitute "Federal health care programs" for purposes of the anti-kickback statute found at 42 U.S.C. § 1320a-7b(b).

3

specifically, the facts set forth herein are based on consensually recorded meetings and telephone calls involving the CW and the defendant AMIT SRIVASTAVA, documents provided by the CW, and reports made to me by other law enforcement agents and the CW.

5. The purpose of this affidavit is limited to setting forth probable cause to arrest the defendant AMIT SRIVASTAVA. Therefore, I have not set forth each and every fact of which I am aware. Additionally, except as otherwise noted, I have not differentiated between information about which I have personal knowledge, and information received from other law enforcement sources or the CW.

6. In this affidavit, I have summarized certain portions of conversations that were recorded with the consent of the CW. Where specific recorded conversations are described, they are set forth in part and in substance, unless otherwise indicated, and where quotations of conversations are used below, the quoted segments are based on preliminary transcriptions, and not on final transcripts.

7. Throughout this affidavit, my beliefs are expressly stated, or, in the context of descriptions of recorded conversations, my beliefs and opinions regarding the meaning and significance of certain statements and terms are set forth in brackets. My beliefs and opinions regarding the meaning and

significance of certain parts of recorded conversations are based on my experience and training in investigating cases involving health care fraud, my review of conversations recorded during the course of this investigation (including conversations not summarized in this affidavit), information obtained from fellow law enforcement officers and the CW, and my overall knowledge of and involvement in this investigation.

Initiation of the Investigation into AMIT SRIVASTAVA and His Introduction to the CW

8.   On January 11, 2005, the CW pled guilty to personal income tax evasion, in violation of Title 26, United States Code, Section 7201.  Pursuant to the terms of a plea agreement entered into between the CW and the government, the CW has, at the direction and under the supervision of the FBI and USHHS, been recording his conversations with two individuals who oversee the operation of a radiological imaging facility located in Brooklyn, New York.  These individuals, who are referred to herein as Co-Conspirator 1 ("CC-1") and Co-Conspirator 2 ("CC-2"), in turn introduced the CW to the defendant AMIT SRIVASTAVA.[4]  CC-1 and CC-2 described SRIVASTAVA as someone who, through contacts with doctors in the New York City area, could arrange

---

[4] CC-1 and CC-2 initially referred to the defendant solely by the first name "Amit."  However, through records of the New York State Department of Motor Vehicles and through the defendant's identification of himself during consensually recorded conversations, the defendant has been identified as AMIT SRIVASTAVA.

5

for patients to be referred to the CW's Queens facility in exchange for kickbacks.

9. On January 22, 2008, during a meeting that took place at the CW's Queens facility, CC-1 and CC-2 first introduced the CW to the defendant AMIT SRIVASTAVA. The CW recorded this conversation by means of an audio recording device concealed on his person, and when the meeting began, only CC-1, CC-2 and the CW were present. During this part of the meeting, CC-1 said to the CW, "Let's talk about this new guy. He seems very aggressive. He has, uh, like two hundred doctors that he knows." CC-1 and CC-2 subsequently referred to this "new guy" as "Amit," and when the CW asked how "Amit" was able to get these doctors, CC-1 said that "Amit" had previously worked for doctors' offices. CC-2 subsequently raised the topic of how much in kickbacks the CW would pay "Amit" for referrals, saying, "So let's discuss before he comes, let's discuss how much to offer." CC-1, CC-2 and the CW discussed how much to pay "Amit" for the referral of patients needing "dopplers"[5] and MRIs, as well as other procedures, and CC-2 said, "So, we are going to tell him today . . . MRIs, one hundred twenty [$120], I told him you can't give him more than that."

---

[5] In this context, the term "doppler" commonly refers to a diagnostic test by which an ultrasound machine is used to examine blood flow in the arteries and veins in a patient's arms and legs.

6

10. Approximately forty-five minutes after the start of this meeting of January 22, 2008, the defendant AMIT SRIVASTAVA arrived at the Queens facility. During the course of the conversation that followed, SRIVASTAVA indicated that he had already caused two patients to be referred to the Queens facility for MRIs, identified the Queens-based doctor (described herein as "CC-3") who had sent the patients, and, referring to this doctor, said, "I'm already taking care of [CC-3]." CC-2 asked SRIVASTAVA how many patients he believed he could send to the Queens facility every two weeks, and SRIVASTAVA responded, "It depends. Sometimes could be ten, sometimes could be fifteen." SRIVASTAVA also mentioned another doctor with whom he worked in the Queens area, and the CW indicated that this other doctors might be referring patients needing x-rays. Further, the defendant SRIVASTAVA received a call on his cellular telephone during the meeting, and during the call, after asking the caller where he or she was sending patients needing MRIs, SRIVASTAVA gave the caller the name of the CW's business. Upon hanging up, SRIVASTAVA immediately said, "See, another doctor is coming," to which the CW responded, "Wow, you work fast!"

11. Also during this recorded conversation of January 22, 2008, the defendant AMIT SRIVASTAVA discussed how much he and the doctors with whom he works expect to be paid for each patient they refer to the Queens facility. In particular, apparently

referring to the kickback amount he wanted for the two patients he had already caused to be referred to the Queens facility, SRIVASTAVA asked, "It's the same number for both the patients?" The CW, having misunderstood, said, "Different phone numbers." SRIVASTAVA then corrected the CW, saying, "No no no no. I mean money numbers." The discussion then turned to the amounts of money that the CW would be required to pay SRIVASTAVA for patients needing various types of radiological procedures, and SRIVASTAVA said, "For MRI, doctor usually want $100." SRIVASTAVA then proceeded to negotiate a kickback payment of $120 for each MRI that he caused to be sent to the Queens facility, $85 for each CT scan, $50 for each echocardiogram, and $35 for each doppler. SRIVASTAVA also said, "You don't believe, I just started doing this in the last, probably, six months, and I grossed so much in the last six months only."

AMIT SRIVASTAVA'S Solicitations of Doctors and His Demands for Kickback Payments

12. In early February 2008, following the above-described meeting in which the defendant AMIT SRIVASTAVA indicated that he had already caused doctors to refer patients to the Queens facility and would continue to have patients referred to the facility in exchange for kickbacks, the CW was advised by his office staff that at least one doctor had called the Queens facility to complain about SRIVASTAVA. In particular, the CW's office staff advised the CW that the complaining doctor did not

know SRIVASTAVA, that SRIVASTAVA had approached the doctor nonetheless, and that SRIVASTAVA offered to pay the doctor in exchange for the doctor sending patients to the Queens facility.

13. Upon learning that the defendant AMIT SRIVASTAVA was apparently approaching doctors he did not know in order to offer them kickbacks, the CW, at the direction of the FBI, met with CC-2 in order to address this issue. In particular, during a February 7, 2008 meeting that the CW recorded by means of a concealed audio recording device, CC-2 asked the CW, "How is this guy, the Amit?" The CW responded by telling CC-2 that people had called to complain about SRIVASTAVA, and that SRIVASTAVA "went to speak to doctors, Indian doctors, that he probably doesn't have a good relationship with." The CW explained to CC-2 that one of the individuals who complained was a doctor, and that SRIVASTAVA had "offered him cash, half his commission, to send MRIs." Referring to SRIVASTAVA, the CW said to CC-2, "This kid is dangerous," and CC-2 responded, "He'll destroy us." CC-2 then gave the CW the cellular telephone number for SRIVASTAVA, and, using the speaker phone on the telephone in his office, the CW placed a call to SRIVASTAVA.

14. When the defendant AMIT SRIVASTAVA answered this telephone call of February 7, 2008, the CW advised SRIVASTAVA

about the complaint the CW had received.  In particular, the CW told SRIVASTAVA the following:

> We had a Dr. [name omitted] call here to the office saying that you, uh, went to see him and that you offered him half of your commission for sending MRIs, and were offering him cash for that. And, and, he was very upset.  He got really upset with the people working here.  And uh, you know, this is not good.  In fact, this is not working. I mean, you told me you had all these people that you know.  Uh, and it looks like you're just cold calling these people and you get, you know, you don't know these people, and, and you're putting us in jeopardy . . . .  I mean, this guy may report us.

After asking for the name of the doctor who had complained and being told by the CW, "we have to be careful," SRIVASTAVA replied, "I know, I know.  What you are saying, I understand absolutely what you are saying . . . ."  SRIVASTAVA also named another doctor (referred to herein as CC-4) who would be sending his patients to the Queens facility, and SRIVASTAVA added that CC-4 had already sent "one patient, two MRIs" to the Queens facility.

   15.  A little over two weeks later, on February 22, 2008, the CW recorded another telephone conversation with the defendant AMIT SRIVASTAVA.  During this conversation, SRIVASTAVA again referred to doctors who were sending patients to the Queens facility, and began to press the CW for the kickback payments the CW had previously agreed to pay.  The CW asked SRIVASTAVA, "how many studies [radiological imaging studies] have you sent so far,

10

do you think?" SRIVASTAVA responded, "with [CC-2]'s office I believe, uh, eleven has been done, and I have two, three more to come." SRIVASTAVA added that, of the eleven patients he had caused to be sent, ten were sent to the Queens facility for MRIs, and one was sent to CC-1 and CC-2's facility. The CW asked if the only doctors whom SRIVASTAVA was having send patients to the Queens facility were CC-3 and CC-4, and SRIVASTAVA replied, "I have Dr. [name omitted; referred to herein as CC-5] also. [CC-5] has just sent x-rays so far, but . . . [CC-5] might have sent the MRIs."

16. After indicating that he had three doctors who were sending patients to the CW, the defendant AMIT SRIVASTAVA indicated that he needed to meet with the CW in the coming days in order to collect the kickback payments that he would in turn share with the doctors. In particular, when the CW asked if he could meet with SRIVASTAVA on the Tuesday or Wednesday of the following week, SRIVASTAVA responded, "You know what, to be honest? The doctors, I have to take care of them, you know?" SRIVASTAVA further said, "As soon is better, maybe this, uh, maybe today, I can come out." Then, apparently referring to payment demands he had already received from the doctors referred to herein as CC-3 and CC-4, and the fact that the CW was not paying him promptly enough, SRIVASTAVA said the following:

> They already called me two or three times, both of them. Okay? So I have, I mean, I

>       have no answer for them. I just been telling
>       them, oh hold on, hold on, I'm sick. So you
>       know, it's embarrassing for me.

The CW (who had already told SRIVASTAVA during this call that he, the CW, was out of town) responded by stating that he would be back on the following Monday, and that he would check his patient records to identify the patients who had been sent by SRIVASTAVA's doctors. SRIVASTAVA asked the CW to recommend a facility that could perform stress tests because he had twenty patients who would be needing stress tests and thus could be referred. The CW stated that he had someone in Queens to recommend to SRIVASTAVA, and said he would get back to SRIVASTAVA about this later. At the conclusion of the call, SRIVASTAVA and the CW agreed to set up a meeting for the following Monday, which was February 25, 2008.

   17. On February 25, 2008, the CW called the defendant AMIT SRIVASTAVA and recorded the conversation. During the conversation, the CW advised SRIVASTAVA that he (the CW) had reviewed his facility's records for patients referred by CC-3, CC-4 and CC-5, and the CW said, "I have all that straightened out." Referring then to the patients that SRIVASTAVA had said he could refer for stress tests, the CW said that on the following day, he and SRIVASTAVA would meet with a friend of the CW's who owned a "nuclear medicine place" in Brooklyn and could perform

the stress tests SRIVASTAVA had previously mentioned.[6]  The CW and SRIVASTAVA agreed to meet the following day in order to visit this nuclear medicine facility.

18.  As agreed, on February 26, 2008, the defendant AMIT SRIVASTAVA met the CW in Brooklyn, outside the location of the nuclear medicine facility the CW had mentioned on the previous day.  The CW recorded this meeting by means of an audio recording device concealed on his person, and prior to entering the nuclear medicine facility, SRIVASTAVA and the CW had a conversation inside the CW's car about the patients SRIVASTAVA was causing to be referred to the Queens facility.  During this conversation, the CW asked SRIVASTAVA if the doctors who were sending patients to the Queens facility were "all your buddies," and SRIVASTAVA replied, "Right."  The CW asked if the doctors wanted only cash, to which SRIVASTAVA responded, "No documentation."  The CW further asked, "Of the money I give you, how much you gonna give the doctors, how much you gonna hold onto?"  SRIVASTAVA at first appeared reluctant to answer, saying "That's internal," but SRIVASTAVA then added, "Sometimes, some doctors take everything.  I don't [U/I], because I have another thing going on with them also."

---

[6]  Nuclear medicine involves the use of radioactive substances to perform tests on patients, and during a stress test, a patient is administered a radioactive material called a "radiotracer."  Stress tests are thus often performed at nuclear medicine facilities.

19. After entering the nuclear medicine facility, the defendant AMIT SRIVASTAVA, the CW and the individual who operated the nuclear medicine facility discussed the referral of patients for stress tests. SRIVASTAVA and the CW then left in the CW's automobile and drove to another nuclear medicine facility in Brooklyn. During the drive, SRIVASTAVA stated that he visits approximately ten or twelve doctors each day, and that, of those ten or twelve, "maybe two doctors get upset with me, but eight will like me . . . out of eight, two doctors will definitely work with me." The CW said to SRIVASTAVA, "You have to be really careful," and indicated that some doctors get nervous about being approached in that manner. SRIVASTAVA responded, "I know. I know," and subsequently added,

> I realize that [U/I] my fault, you know. I should not offer doctors like this. But some doctors, they, they love to hear that. That at least someone has got the guts to come to me and ask me [U/I] to make money.

20. Subsequently in this conversation, after the defendant AMIT SRIVASTAVA and the CW drove to the second nuclear medicine facility but found it to be closed, SRIVASTAVA asked the CW for payments owed based on the patients SRIVASTAVA had caused to be referred. The CW indicated that he had not brought any money with him, and SRIVASTAVA immediately began to complain, stating, "Give me something, whatever. Actually I have to take care of someone." The CW again stated that he could not pay

SRIVASTAVA at the time, and SRIVASTAVA continued to complain, saying, "You are not ready with the money? . . . Oh my god . . . . It's shameful." The CW told SRIVASTAVA that he (the CW) would pay SRIVASTAVA on the following day, and after still further complaints, SRIVASTAVA left the CW's vehicle.

AMIT SRIVASTAVA's Continued Demands For, and Initial Receipt of, Kickback Payments for the Referral of Patients

21. On February 29, 2008, the defendant AMIT SRIVASTAVA arrived unexpectedly at the Queens facility and again sought to be paid for the patients he had caused to be referred. The CW, who was leaving the facility at the time and was not wearing a recording device, told SRIVASTAVA that he (the CW) was leaving, and that he would call SRIVASTAVA on the following Monday.

22. On March 3, 2008, the CW called the defendant AMIT SRIVASTAVA, and the call was recorded with the CW's consent. Near the outset of the call, the CW referred to patients that SRIVASTAVA had caused to be sent to the Queens facility, and said, "We did an analysis, okay? Everything looks good." The CW and SRIVASTAVA discussed the specific number of patients that SRIVASTAVA had caused to be sent to the Queens facility, and the conversation between SRIVASTAVA and the CW included the names of various patients, the radiological tests that were performed as to those patients, and the doctor who referred certain patients. During this portion of the conversation, the CW advised

15

SRIVASTAVA that doctors CC-3 and CC-4 had referred patients for twelve MRIs and one CT scan. Then, referring to the payments he owed SRIVASTAVA for these referrals, the CW said, "I'll figure this out. I know how much it's going to be." SRIVASTAVA replied, "Alright, no problem." The CW and SRIVASTAVA agreed to meet on the following day at the Queens facility.

23. On March 4, 2008, during a meeting at the Queens facility, the defendant AMIT SRIVASTAVA collected his first set of kickback payments for patients he had caused to be referred to the CW. At the outset of the meeting, which was audio- and video-recorded by means of a concealed device, SRIVASTAVA and the CW reviewed lists that the CW had prepared containing the names, dates of services, tests performed, and insurance providers for patients referred to the CW by the doctors referred to herein as CC-3 and CC-4. Based on the lists, as well as the fact that an additional patient not on the lists had also been referred to the CW, SRIVASTAVA and the CW agreed that the CW owed SRIVASTAVA $1,440 for twelve MRIs that SRIVASTAVA caused to be referred to the CW. The CW and SRIVASTAVA also agreed that one patient had been referred to the CW for a CT scan, and when the CW indicated that the kickback amount for the CT scan was $60, SRIVASTAVA corrected him and stated that they had agreed upon an $85 payment for CT scans. The CW responded that he nonetheless could pay SRIVASTAVA only $1,500 because that was all he had taken out of

the bank, and the CW agreed to pay SRIVASTAVA the remaining $25 on a future date. The CW then counted out fifteen one-hundred dollar bills and handed the money to SRIVASTAVA. SRIVASTAVA took the money, counted it, said "Okay," and put it into his wallet.

24. A review of the lists that the defendant AMIT SRIVASTAVA and the CW reviewed during the course of this meeting of March 4, 2008 indicates that certain of the referred patients for whom kickbacks were being paid were insured by federal health care programs. In particular, with respect to the patients who had been referred to the CW through SRIVASTAVA's dealings with doctor CC-3, one was insured by Medicare, and one was insured by Metroplus, which is a Medicaid managed care plan. Further, with respect to the patients who had been referred to the CW through SRIVASTAVA's dealings with doctor CC-4, five were insured by Metroplus, and one was insured by Magnacare, which is a Medicare managed care plan.

25. After the CW paid the defendant AMIT SRIVASTAVA $1,500 in kickbacks during this meeting of March 4, 2008, SRIVASTAVA asked, "So how often you going to see me now?" The CW proposed that he and SRIVASTAVA meet every two weeks in order for future payments to be made, and the CW told SRIVASTAVA to call him on his cellular telephone. SRIVASTAVA replied, "No no," and when the CW asked, "You don't want to leave a message?",

SRIVASTAVA indicated that he was concerned about law enforcement agents tapping his telephone and reviewing his messages:

> [I]f somebody leave you a message and you get caught [U/I] or something happen, they can tap your messages also, who's leaving messages or what. In my understanding, this is between you and I, you never know, they tap your messages also, they go to your phone, they listen to all your messages.

SRIVASTAVA further explained that if law enforcement authorities heard two individuals agree, on their voice mail, to set up a meeting, the authorities would conduct surveillance of the meeting in order to determine what "transaction" the two individuals were doing. "You've been watching HBO too much," the CW responded.

AMIT SRIVASTAVA's Continued Solicitation and Receipt of Kickback Payments

26.  Following the above-described meeting of March 4, 2008, the defendant AMIT SRIVASTAVA continued to solicit kickback payments in exchange for causing patients to be referred to the CW, and SRIVASTAVA collected such kickback payments on three separate occasions. In particular:

a.  On April 15, 2008, in a meeting that took place in Queens and which the CW recorded by means of an audio-recording device, SRIVASTAVA collected $575 in cash from the CW for four MRIs and one CT scan that SRIVASTAVA had arranged through his dealings with doctor CC-3. Based on lists that SRIVASTAVA and the CW reviewed during the meeting, Metroplus

18

insured the patients for whom the four MRIs were performed, and Medicare insured the patient for whom the CT scan was performed.

    b. On June 12, 2008, in a meeting that took place in Queens and which the CW recorded by means of an audio- and video-recording device, SRIVASTAVA collected $580 in cash from the CW for three MRIs, one CT scan, and two dopplers that SRIVASTAVA had arranged through his dealings with doctor CC-3 and with another doctor, CC-6, who had begun sending patients to the CW earlier that month.[7]  Based on a list that SRIVASTAVA and the CW reviewed during the meeting, Medicare insured two of the patients for whom MRIs were performed.

    c. On June 26, 2008, in a meeting that took place in Queens and which the CW recorded by means of an audio- and video-recording device, SRIVASTAVA collected $940 in cash from the CW for six MRIs and two CT scans that SRIVASTAVA had arranged through his dealings with doctors CC-3 and CC-6.  Based on a list that SRIVASTAVA and the CW reviewed during the meeting, Elderplan, which is a Medicare managed care plan, insured one of the patients for whom an MRI was performed.

  WHEREFORE, I respectfully request that an arrest warrant issue for the defendant AMIT SRIVASTAVA, so that he may be dealt with according to law.

---

  [7] This $580 also included the CW's payment of $50 to SRIVASTAVA for prior instances in which the CW had not paid SRIVASTAVA the full amount he had agreed to give for CT scans.

WHEREFORE, I further respectfully request that this affidavit be and remain sealed until further order of the Court.

_____
JODI COHEN
Special Agent
Federal Bureau of Investigation

Sworn to before me this 2

_____
                    JUDGE
EASTERN DISTRICT OF NEW YORK